IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JIM ANGLEMYER**<br>7039 Pindell School Rd.<br>Fulton, MD 20759<br><br>    Plaintiff,<br><br>    v.<br><br>**WCS CONSTRUCTION, LLC**<br>    Serve Registered Agent:<br>    Terry Beauford<br>    3303 Stanton Road, SE<br>    Washington, D.C. 20020<br><br>**WCS CONSTRUCTION DEVELOPMENT, LLC**<br>    Serve Registered Agent:<br>    Bradley J. Fennell<br>    1100 New Jersey Ave., SE Suite 1000<br>    Washington, DC 20003<br><br>**WILLIAM C. SMITH & CO., INC.**<br>    Serve Registered Agent:<br>    Terry Beauford<br>    10509 Martinellini Drive<br>    Laurel, MD 20723<br><br>    Defendants. | Civ. No. _____<br><br>**Jury Trial Demand** |

**COMPLAINT AND JURY DEMAND**

COMES NOW, the Plaintiff, Jim Anglemyer ("Plaintiff" or "Mr. Anglemyer"), by and through undersigned counsel, and brings this Complaint seeking Judgment against WCS Construction, LLC, WCS Construction Development, LLC, and William C. Smith & Co., Inc. (collectively "Defendants") for wrongful termination in violation of the public policies of the District of Columbia.

## JURISDICTION & VENUE

1. This Court has jurisdiction of Plaintiff's claims herein pursuant to 28 U.S.C. § 1332, as Defendants are based in the District of Columbia, and because the total amount in controversy exceeds $75,000.00.

2. Venue herein is proper under 28 U.S.C. § 1391 (b) and (c), as Defendants operate and are based in Washington, D.C.

## PARTIES

3. Plaintiff is an adult male resident of the State of Maryland, residing at 7039 Pindell School Road, Fulton, Maryland 20759. Plaintiff was a former employee of Defendants.

4. Defendant WCS Construction, LLC ("WCS Construction") is a corporation that conducts business completing construction projects within the jurisdictional boundaries of the District of Columbia. WCS Construction's principal place of business is in the District of Columbia at 3303 Stanton Road, SE, Washington, D.C. 20020. WCS Construction is affiliated with W.C. Smith Corporation and is owned by Christopher Smith, for whom Mr. Anglemyer worked. WCS Construction hired Plaintiff and is subject to the laws preventing wrongful termination in employment as set forth more fully in the Count that follows.

5. Defendant WCS Development Corporation Inc. ("WCS Development") is a Washington D.C. corporation operating out of 1100 New Jersey Ave SE # 1000, Washington, D.C. 20003. Defendant WCS Development controlled the terms and conditions of Mr. Anglemyer's employment and is wholly owned and/or operated as an enterprise by Christopher Smith.

6. Defendant William C. Smith & Co. is a corporation organized under the laws of Maryland and governed the terms and conditions of Mr. Anglemyer's employment, including, specifically, the handling, reporting and processing of workplace violence complaints.

## **FACTS**

**Mr. Anglemyer's Military and Professional Background**

7. Mr. Anglemyer has had a long a distinguished career as a professional executive, and in the military. Prior to starting his career in the construction industry, Mr. Anglemyer served in the U.S. Army in the Republic Vietnam and was assigned to D Company, 1st Battalion, 502 Regiment of the 101st Airborne. While serving in Vietnam, Mr. Anglemyer was shot five times during the Tet Offensive outside of the Hue Province and received a Purple Heart. After recovering from his wounds in Zama, Japan and then at Walter Reed Army Hospital, Mr. Anglemyer received a transfer to Fort Bragg, North Carolina to the 82nd Airborne, and then was transferred again to Special Forces. Mr. Anglemyer ultimately receiving an honorable discharge.

8. Following his distinguished years of military service, Mr. Anglemyer worked in construction, learning the ins and outs of the industry through his own company, Anglemyer Construction, Inc. Mr. Anglemyer then served as Project Manager, Vice President, Senior Vice President and President for various construction enterprises, generating revenue by winning contract bids, managing and completing construction projects, and even handling legal compliance issues.

9. Mr. Anglemyer began working for Defendants and WCS Construction as its President on or about June 15, 2001.

10. WCS Construction operates as a general contractor for the construction of commercial and residential projects throughout the Washington D.C. metro area, performing on contracts worth about $146 million dollars annually.

11. Prior to Mr. Anglemyer's tenure with Defendants, WCS Construction was a smaller operation, with its headquarters doubling as a maintenance shop for W.C. Smith. WCS

Construction, while affiliated with W.C. Smith Corporation and owned by Chris Smith, remained a separate Limited Liability Corporation (LLC).

12. Mr. Anglemyer began generating profits immediately for WCS Construction. And from the time Mr. Anglemyer began working as President, Mr. Smith never invested any money into WCS Construction, although there were many occasions where profits were removed by Mr. Smith.

13. During the course of Mr. Anglemyer's tenure as President, WCS Construction made tremendous strides in project execution and revenue generation. Specifically, Mr. Anglemyer's connections with various subcontractors, and his oversight and attention to detail from the bidding phase through the completion of construction, allowed WCS Construction to gain substantial profits every year since his arrival in 2001.

14. In fact, the growth of WCS Construction under Mr. Anglemyer's leadership, was evidenced by the number of employees hired during his term, including two Vice Presidents brought on to help manage the growing number of projects under contract.

15. Throughout Mr. Anglemyer's sixteen (16) years as President, he dealt with subcontractors, vendors, third party developers and clients, directly without supervision. Mr. Anglemyer cultivated relationships that fostered Defendants' robust growth during that period. This growth has been acknowledged by Mr. Anglemyer's direct reports and colleagues, including Scott Vossler, who stated that Mr. Anglemyer "took a company that was less than two million dollars, and built it into a hundred plus million dollar company," leaving "[WCS] in a good financial position."

**Mr. Anglemyer receives and reports a threat of workplace violence**

16. On June 15, 2017, Mr. Anglemyer engaged in an informal meeting in his office with his Executive Assistant, Jackie Perkins, Mike Christopher, Defendants' Chief Financial Office, and Cris Shaw, a Vice President of WCS Construction, concerning Federal Realty Investment Trust ("FRIT") and the Pike and Rose project. FRIT was the third-party developer working the Pike and Rose project, which was headed from FRIT's side by John Davies. Mr. Shaw oversaw the Pike and Rose project for WCS and ultimately reported to Mr. Anglemyer, who was the company President at the time.

17. Shortly after Mr. Shaw entered Mr. Anglemyer's office on June 15, 2017, Mr. Anglemyer left to set up another meeting. When he left, Ms. Perkins, Mr. Christopher, and Mr. Shaw remained in Mr. Anglemyer's office.

18. Subsequently, Ms. Perkins reported to Mr. Anglemyer that while they were in Mr. Anglemyer's office, Mr. Shaw made specific threats of violence against John Davies of FRIT and threatened to shoot himself. Ms. Perkins reported words to the effect that: "Cris Shaw said he 'felt like driving down to the FRIT office and taking his gun and shooting himself in the head.'" Ms. Perkins explained that she was shocked. She asked if he was serious and questioned if he would "kill yourself?" She reported that Mr. Shaw responded "after I shoot John [Davies] first," then I would "kill myself in front of the building."

19. Mr. Shaw was not making jokes on June 15. After this incident, Ms. Perkins remained alarmed and fearful. Indeed, Mr. Shaw admitted to being frustrated with John Davies previously. The environment at that project was stressful and employees were, at times, angry.

20. Furthermore, Mr. Shaw's former Assistant, Krista Poole, stated that she knew Mr. Shaw to be an "angry, difficult and unstable employee." Ms. Poole said that Mr. Shaw bragged

about "putting [people] in their place." On one occasion, Ms. Poole recalled going with Mr. Shaw to get a contract from his car. Ms. Poole stated that, at that time, "[Mr. Shaw] immediately took out a gun and showed it off to me. He even bragged that he served in the military and had shot someone."

21. Mr. Shaw owns multiple guns, including an AR-15, Glock 17, .374 Magnum, 7 Plus 686, and a Mossberg 12 Gauge. Mr. Shaw, who resides in Maryland, carried guns in his car, including to and from worksites. He further carried those firearms in and out of the District of Columbia. Upon knowledge, information, and belief, these guns are not registered in D.C. in violation of D.C. Code § 7–2502.01.

22. Ms. Perkins reported Mr. Shaw's statements to Mr. Anglemyer, who was President of the company at the time.

23. Defendants' policies provide that employees "have the right to work in an environment free of threats or violence." Defendants do not tolerate "any level of threat or violence in the workplace and will take immediate action on all reported occurrences." Furthermore, Defendants ensure that employees reporting such behavior "will not suffer intimidation or reprisal." All violence or threats of violence, whether indirect or direct, should be reported to the employee's supervisor, Human Resources, or any other members of management. Anyone determined responsible for threats of violence or actual violence "will be subject to corrective action, including termination." Employees of Defendants' should, depending on severity, report "suspicious individuals or activities" to 911 and/or the company.

24. In accordance with the aforementioned policy, Mr. Anglemyer directed Ms. Perkins to 1) contact the authorities; and 2) notify human resources. Ms. Perkins drafted a letter

documenting the incident and delivered it to Mike Christopher (WCS's CFO), who was present at the time of the threat.

25.     On or about June 28, 2017, Mr. Anglemyer learned that, after Ms. Perkins complaint, Human Resources never requested that Mr. Shaw be put on administrative leave, nor had it notified Mr. Anglemyer of any investigation findings.  In fact, Defendants allowed Mr. Shaw to continue working on the Pike and Rose project with John Davies, without notifying FRIT about Mr. Shaw's threats.

26.     That same day, Mr. Anglemyer spoke to Brian Spencer, another FRIT representative involved in the Pike and Rose project, and advised Mr. Spencer of Mr. Shaw's violent threat towards John Davies.  Because Mr. Anglemyer, as WCS Construction's President, often worked directly with third party developers like FRIT, without having to clear such communications internally, his cautious actions in notifying FRIT about the safety of its own employee were wholly appropriate and necessary.

27.     On or about June 29, 2017, FRIT's Senior Vice President of Development, Ramsey Meiser, sent a letter to Mr. Anglemyer and WCS Construction appropriately requesting that Mr. Shaw be removed from the Pike and Rose project.

**Mr. Smith terminates Mr. Anglemyer's employment**

28.     On or about June 28, 2017, Mr. Smith and WCS Construction's Human Resources office had Mr. Anglemyer announce his "retirement."

29.     Subsequently, on or about July 11, 2017, Mr. Anglemyer met with Mr. Smith, supposedly to discuss Mr. Shaw's threat of workplace violence.  However, during the July 11th meeting, Mr. Smith terminated Mr. Anglemyer's employment, informing Mr. Anglemyer that he was no longer a part of WCS.

30.     Incredibly, Mr. Smith said that Mr. Anglemyer was "not acting in the best interest of the company" when he 1) instructed Ms. Perkins to contact HR in accordance with the company manual; 2) instructed her to inform the authorities to protect the life of John Davies; and 3) informed FRIT that there was a serious threat of violence against one of its employees.

31.     In his conversations with Mr. Anglemyer, Mr. Smith appeared more concerned with sweeping the matter under the rug than with addressing the threat of gun violence.  Mr. Smith said, "it's obvious by your action that we can't work together."  Stated otherwise, complying with the company manual, acting in accordance with the law, and acting to protect the life of others, was less important than hiding the threat of workplace gun violence from third parties, including those threatened.

32.     Moreover, Mr. Anglemyer advised Mr. Smith of the issue shortly after Ms. Perkins' complaint; thus, Mr. Smith was aware of and had no prior issues with Mr. Anglemyer's handling of WCS Construction operations until Mr. Anglemyer's communications with others concerning gun violence.

**Shortly after terminating Mr. Anglemyer, Defendants retaliate against Ms. Perkins, terminating her employment**

33.     Additionally, Ms. Perkins' complaints were not taken seriously by Mr. Smith or Defendants and she almost immediately suffered retaliation.  Shortly after her complaint about Mr. Shaw, Ms. Perkins was relocated to a trailer in the same worksite as Mr. Shaw.  She had uncomfortable interactions with Mr. Shaw and complained of retaliation.  Defendants terminated her employment on August 22, 2017.

34.     Ms. Perkins filed an action for wrongful termination in the United States District Court for the District of Columbia.  Civil Action No.: 18-751 (RC).  In a written opinion, the District Court concluded that that Ms. Perkins' sufficiently alleged "her termination for reporting

illegal conduct implicated the public policy exception" for wrongful discharge and that the series of events starting after Perkins reported the June 15, 2017 incident and culminating with her termination less than two months later, sufficiently alleged a causal connection to survive a motion to dismiss. *Perkins v. WCS Constr., LLC*, 2018 U.S. Dist. LEXIS 188857, *28, 2018 WL 5792828 (D.D.C. Nov. 5, 2018). Subsequently, after completing discovery, Ms. Perkins' case survived Defendants' motion for summary judgment, with the District Court finding that "an employer should not be permitted to fire an employee for reporting or complaining about a threat of violence." *See id.* (ECF #24).

35. At all times relevant herein, W. Christopher Smith, the owner of WCS Development, WCS Constructions and William C. Smith & Co., Inc., made the decision to terminate Mr. Anglemyer's employment. Mr. Smith discharged the Plaintiff for an improper or illegal purpose and with malice and in direct contravention of his right to report a crime. *Myers v. Alutiiq Int'l Solutions, LLC*, 811 F. Supp. 2d 261, 269 (D.D.C. 2011).

36. Defendants, through their authorized agents within the scope of their authority, have caused the acts and/or omissions complained of herein.

## COUNT I

### Wrongful Termination in Violation of Public Policy

37. Plaintiff adopts and incorporates each and every allegation contained in each of the foregoing paragraphs as fully restated herein.

38. On June 15, 2017, Plaintiff engaged in an informal meeting in his office with Ms. Perkins, Mr. Christopher, and Mr. Shaw concerning FRIT and the Pike and Rose project. Mr. Shaw oversaw the Pike and Rose project for WCS Construction.

39. Shortly after Mr. Anglemyer left to set up for another meeting, "Cris Shaw said he 'felt like driving down to the FRIT office and taking his gun and shooting himself in the head,'" as noted by Ms. Perkins. Ms. Perkins explained that she was shocked. Ms. Perkins asked if he was serious and questioned if he would "kill yourself"? She reported that Mr. Shaw responded "after I shoot John [Davies] first," then I will "kill myself in front of the building."

40. After this incident, Ms. Perkins, alarmed and fearful, realized that Mr. Shaw previously admitted to being frustrated with John Davies, and the environment at that project was stressful, as employees were, at times, angry.

41. Furthermore, Mr. Shaw owns multiple guns, including an AR-15, Glock 17, .374 Magnum, 7 Plus 686, and a Mossberg 12 Gauge. Mr. Shaw carried guns in his car, including to and from worksites. He further carried those firearms in and out of the District of Columbia. Upon knowledge, information, and belief, these guns are not registered in D.C. in violation of D.C. Code § 7–2502.01. And Mr. Shaw's former Assistant, Ms. Poole, even stated that she knew Mr. Shaw to be an "angry, difficult and unstable employee." Ms. Poole said that Mr. Shaw bragged about "putting [people] in their place." On one occasion, Ms. Poole recalled going with Mr. Shaw to get a contract from his car. Ms. Poole stated that, at that time, "[Mr. Shaw] immediately took out a gun and showed it off to me. He even bragged that he served in the military and had shot someone."

42. Ms. Perkins reported Mr. Shaw's threats to Mr. Anglemyer, who was President of the company at the time.

43. WCS Construction's policy provided that employees "have the right to work in an environment free of threats or violence." The company does not tolerate "any level of threat or violence in the workplace and will take immediate action on all reported occurrences."

Furthermore, WCS Construction ensures that employees reporting such behavior "will not suffer intimidation or reprisal." All threats of violence or violence, indirect and direct, should be reported to the reporting employee's supervisor, Human Resources, or any other members of management. Anyone determined responsible for threats of violence or actual violence "will be subject to corrective action, including termination." Employees of WCS Construction should, depending on severity, report "suspicious individuals or activities" to 911 and/or the company.

44. In accordance with WCS Construction's policy, Mr. Anglemyer advised Ms. Perkins to 1) contact the authorities; and 2) notify human resources. Ms. Perkins drafted a letter documenting the incident and delivered it to Mr. Christopher, who was present at the time of the threat.

45. Subsequently, on or about July 11, 2017, Mr. Smith terminated Mr. Anglemyer's employment, informing Mr. Anglemyer that he was no longer an employee of Defendants.

46. Incredibly, Mr. Smith said that Mr. Anglemyer was "not acting in the best interest of the company" when he 1) instructed Ms. Perkins to consult with HR in accordance with the company manual; 2) instructed her to inform the authorities to protect the life of John Davies; and 3) informed FRIT that there was a serious threat of violence against one of their employees. Mr. Smith said, "it's obvious by your action that we can't work together." Stated otherwise, complying with the company manual, acting in accordance with the law, and acting to protect the life of others, was less important than the reputation of the company.

47. Additionally, Ms. Perkins' complaints were not taken seriously by Mr. Smith or Defendants and she almost immediately suffered retaliation. Ms. Perkins was relocated to a trailer in the same worksite as Mr. Shaw and was terminated on August 22, 2017.

48. Terminating Mr. Anglemyer for participating in protecting Mr. Davies, Ms. Perkins, and any other employee who could have been injured or killed by Mr. Shaw is in violation of public policy. This termination violates clear mandates of public policy of the District of Columbia, including:

   a. The public policy of preserving bodily integrity.

   b. The public policy protecting employees who report conduct involving assault or battery.

   c. The public policy to encourage citizens to report criminal activity to the authorities.

   d. The public policy precluding intimidation for reporting or participating in a report of criminal activity.

   e. The public policy in favor of Mr. Anglemyer's refusal to engage in the illegal or wrongful conduct of intimidating, harassing, and retaliating against Ms. Perkins and his refusal to engage in Mr. Smith's scheme to intimidate, harass, and encourage her *not* to report the wrongful conduct.

   f. Performing the nondelegable duty of providing a safe place to work and only retain competent nonviolent employees.

49. Defendants further retaliated against Mr. Anglemyer for engaging in these protected activities and for failing and refusing to engage in its unlawful scheme of intimidation, harassment, and retaliation related to this potentially dangerous situation.

50. A worker can bring a wrongful discharge claim under the public policy exception of the at-will employment doctrine for reporting an employer's conduct. *Freas v. Archer Services, Inc.* 716 A. 2d 998 (D.C. Ct App 1998).

51. A worker may also bring a wrongful discharge claim for being terminated for reporting a co-worker's illegal conduct. *See Washington v. Guest Services. Inc.* 718 A 2d 107 (1998).

52. These public policies are embodied in D.C. Code § 22-404(a)( l) which states "whosoever unlawfully assaults, or threatens another in a menacing manner"; § 22-13-1 which prohibits "affray"; § 22- 1810 which declares it a felony against "whosoever threatens ... within the District of Columbia…to injure the person of another"; and D.C. Code § 22-1931 which prohibits the interfering of any criminal report to a law enforcement agency. These violated public policies are not exhaustive, but merely illustrative.

53. Furthermore, these criminal statutes were enacted to protect the personal freedoms, health, safety, and welfare of the general public.

54. Because Mr. Anglemyer was discharged for reporting a criminal threat, and was a member of the general public whom the criminal statues were designed to protect, the discharge violates public policy.

55. Intentional torts such as a claim for wrongful discharge in violation of public policy necessarily carry the specter of punitive damages. *Daka, lnc.*, *v. McCrae*, 839 A.2d 682 (D.C. 2003).

56. As a direct and proximate result of the acts and omissions of the Defendants in unlawfully discharging Mr. Anglemyer, Plaintiff has suffered economic and emotional injuries including, but not limited to, lost salary, lost employee benefits, loss of reputation, shame, embarrassment, humiliation, shock, pain and suffering, mental anguish, anxiety, and distress.

57. Defendants' and Mr. Smith's conduct in terminating Mr. Anglemyer was deliberate, malicious, willful, and intentionally calculated to inflict harm upon Mr. Anglemyer.

WHEREFORE, for the all of the aforementioned reasons, Plaintiff respectfully demands judgment against Defendants, to include compensatory damages, punitive damages, fees and costs, including a request that this Court:

1. Issue a declaratory judgment that the acts and practices of Defendants complained of herein have violated the civil rights and employment rights of Plaintiff;

2. Order Defendants to award Plaintiff compensatory damages for the emotional harm and the decrease in the enjoyment of his life which he has suffered as a result of Defendants' unlawful actions in violation of his rights;

3. Order Defendants to award Plaintiff damages for loss of back pay, front pay, and other lost wages and benefits to which Plaintiff was promised and is entitled, and that which Defendants are withholding unlawfully;

4. Order Defendants to pay reasonable attorneys' fees and litigation expenses incurred in this matter; and

5. Issue a judgment against Defendants for punitive damages, plus interest, and other relief as the nature of the case may require; and

6. Order any additional relief as the Court deems proper and just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues of triable fact in the foregoing complaint.

DATE: July 9, 2020                                                      Respectfully submitted,

JOSEPH, GREENWALD & LAAKE, P.A.

/s/     Jay P. Holland
Jay P. Holland, Esq. (Bar No. 422258)
JOSEPH, GREENWALD & LAAKE, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
301.220.2200 (T)
301.220.1214 (F)
jholland@jgllaw.com
*Counsel for Plaintiff*